UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANNE THOMAS,

                               Plaintiff,

                v.

VNS HEALTH,

                              Defendant.
-------------------------------------------------------------X

Case No.: 1:23-cv-08821

**AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Dr. Anne Thomas ("Dr. Thomas" or "Plaintiff"), by and through her attorneys, Wigdor LLP, as and for her Complaint against VNS Health ("VNS" or the "Company"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1. Dr. Thomas has dedicated over 30 years as a psychiatrist to improving the lives of her patients who suffer from mental health issues.

2. Unfortunately, Dr. Thomas's expertise and commitment were disregarded when she requested a simple, reasonable accommodation to continue performing the job that she loves remotely.

3. VNS and its leadership, including Jessica Aitken ("Ms. Aitken"), Associate Director, Behavioral Health Programs/Assertive Community Treatment ("ACT"), refused to engage in an interactive process with Dr. Thomas about her accommodation request, as required by law.

4. Moreover, Dr. Thomas faced a culture of age discrimination, in which she was deemed as "old" and a "bloodsucker."

5. On September 23, 2022, VNS terminated Dr. Thomas's employment without notice to her patients.

1

6. By doing so, VNS put numerous patients in serious danger.

7. Defendant's conduct violated the Americans with Disability Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the New York State Human Rights Law; N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law; N.Y.C. Administrative Code §§ 8-107 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PREREQUISITES

8. On July 20, 2023, Plaintiff filed a Charge of Discrimination and Retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Plaintiff a Notice of Right to Sue on November 28, 2023.

9. Under NYCHRL § 8-502, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

10. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA. This Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

13. Plaintiff Anne Thomas, M.D., is a former staff psychiatrist at VNS who resides in New York. At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

14. Defendant VNS is a New York based company located at 220 East 42nd Street, New York, New York 10017. At all relevant times, Defendant met the definition of an "employer" and/or a "covered employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

I. **DR. THOMAS'S BACKGROUND AND EXPERTISE**

15. Dr. Thomas is a highly qualified and established psychiatrist with over 30 years of experience treating patients who suffer from mild to severe mental illness.

16. In 1976, Dr. Thomas received her Medicine Doctorate (M.D.) from State University of Haiti, School of Medicine and Pharmacy and subsequently served as a fellow at Kings County Hospital in Brooklyn, New York.

17. From 2004 to 2012, Dr. Thomas joined Lutheran Medical Center as a child psychiatrist.

18. Dr. Thomas spent the next three years working at Interfaith Medical Center, treating adult patients who suffered from mental illness.

19. In July 2016, Dr. Thomas began working for VNS through a staffing agency before VNS directly hired her as a staff psychiatrist in December 2016.

20. Dr. Thomas excelled at VNS, serving as Lead Psychiatrist on the ACT team since December 2016. As Lead Psychiatrist, Dr. Thomas supervised two nurses and several social workers.

21. Dr. Thomas and the ACT team served vulnerable, high-risk individuals who have not been able to engage in traditional outpatient services.

22. Dr. Thomas reported to Dr. Jovita Crasta ("Dr. Crasta"), Medical Director, Outpatient Psychiatry.

23. During her tenure, Dr. Thomas cared for 68 patients, establishing her as the psychiatrist with the highest caseload on her team.

24. In addition to supervising her patients' care and medication, Dr. Thomas also made monthly visits to her patients' homes (i.e., conducted "field work").

25. Field work required Dr. Thomas to drive herself to her patients' homes, which spanned four of the five boroughs of New York, and required her to walk up several floors to reach her patients.

26. Despite the physical toll that it took to travel to meet with each of her 68 patients, Dr. Thomas loved her job and remained loyal to her patients throughout her entire tenure.

## II.   DR. THOMAS'S DISABILITY AND VNS'S FAILURE TO ACCOMMODATE

27. Dr. Thomas suffers from osteoarthritis in her knees and venous insufficiency in both of her legs, making it difficult for her to walk, stand and drive long distances herself. Because of her condition, Dr. Thomas at times relies on a cane for support when she is mobile.

28. In June 2020, amid the COVID-19 Public Health Emergency ("PHE"), Dr. Thomas and all other treating providers at VNS worked remotely. During this time, Dr. Thomas successfully conducted her patient visits and daily rounds virtually over Zoom.

29. In or around June 2022, Dr. Thomas learned that VNS would require its employees to return to the office and resume field work.

30. By this time, Dr. Thomas's venous insufficiency in both of her legs had worsened and she had become increasingly vulnerable to COVID-19.

31. On June 14, 2022, Dr. Thomas uploaded a letter from her treating rheumatologist, Dr. Jordan Brodsky ("Dr. Brodsky"), to her Workday account.

32. Dr. Brodsky treated, and continues to treat, Dr. Thomas for pain management and physical therapy. He also prescribes steroids to address her medical conditions.

33. Dr. Brodsky's letter specifically explained that "[d]ue to [Dr. Thomas's] underlying condition and treatment, [she] is immunocompromised. It is advisable that the patient avoid exposure to" COVID-19 as "[s]he is at high-risk for severe complications should she contract COVID-19."

34. Dr. Brodsky further requested that VNS provide Dr. Thomas an accommodation to allow her to continue working remotely.

35. At no point did anyone from VNS—neither Human Resources ("HR") nor any other representative, including Dr. Crasta—engage with Dr. Thomas about her accommodation request as required by law.

36. Instead, Dr. Thomas's accommodation request was met with silence and, subsequently, denial.

37. In July 2022, Dr. Thomas happened to check her Workday profile and noticed that her request for accommodation was designated as "declined" without further instruction or explanation.

38. A few days later, Marion Spencer ("Ms. Spencer"), former ACT Team Manager, called Dr. Thomas. Ms. Spencer confirmed that she had seen the letter and accommodation request in Dr. Thomas's Workday account.

39. As the ACT Team Manager, Ms. Spencer reviewed incoming requests, including accommodation requests, from the ACT Team.

40. However, Ms. Aitken specifically directed Ms. Spencer not to approve any accommodation request that Dr. Thomas submitted.

41. Ms. Spencer, who was alarmed by Ms. Aitken's behavior, told Ms. Thomas that she believed Ms. Aitken was a "threat" to Dr. Thomas. She further explained how Ms. Aitken was angered by Dr. Thomas's accommodation request and told Ms. Spencer that she was seeking to "build a case against" Dr. Thomas and was "out to get" her.

42. In August 2022, Ms. Aitken requested to meet with Dr. Thomas *via* Zoom.

43. During this meeting, Ms. Aitken refused to engage with Dr. Thomas's accommodation request, as required by law.

44. Rather, Ms. Aitken presented Dr. Thomas with two options for continued employment with VNS. Ms. Aitken proposed that Dr. Thomas could either: (i) return to work and conduct in-home patient visits or (ii) join the Queens ACT team, requiring up to 20-40% field work.

45. Dr. Thomas protested that neither option was feasible, given her medical condition and ongoing health issues, and requested time to consider her options.

46. On September 15, 2022, Dr. Thomas met with Ms. Aitken, Ms. Spencer, Dr. Crasta and Patricia Kissi (Clinic Director) *via* Zoom.

47. Ms. Aitken again presented Dr. Thomas with the same two unreasonable options that required in-person return to work without mention of Dr. Thomas's outstanding accommodation request.

48. Dr. Thomas reiterated that she could not conduct fieldwork due to her medical condition and pleaded that they discuss her accommodation request that she had submitted in June 2022.

49. Without addressing Dr. Thomas's prior request, Ms. Aitken said that Ms. Spencer would initiate a meeting with HR to discuss the accommodation process.

50. Tellingly, Ms. Aitken requested that Dr. Thomas submit her accommodation request by September 19, 2022, confirming Dr. Thomas's belief that her initial accommodation request from June was "declined" without any engagement from the Company.

51. Ms. Aitken then stated that they would meet on September 19th to finalize Dr. Thomas's plans.

52. On September 19, 2022, Dr. Thomas advised Ms. Aitken that no one had addressed her request for accommodation or scheduled a follow-up meeting with her.

53. At this point, Dr. Thomas's fate had been sealed.

### III. DR. THOMAS FACES AGE DISCRIMINATION

54. In addition to VNS's unlawful conduct in failing to accommodate her, VNS also discriminated against Dr. Thomas because of her age.

55. In or around 2019, Dr. Thomas learned from Collette Hendricks ("Ms. Hendricks"), a Registered Nurse, that Ms. Aitken was having problems getting along with the doctors.

56. Ms. Hendricks told Dr. Thomas that Ms. Aitken referred to the other older physicians as "bloodsuckers."

57. Upon information and belief, Ms. Aitken is in her 30s and the doctors at VNS are older than her. Dr. Thomas is significantly older than Ms. Aitken.

58. Given the age difference, Dr. Thomas's interpretation of Ms. Aitken's comment was that she disliked working with older employees and favored younger employees.

59. In June 2022, Dr. Crasta emailed Caroline Williams and Ms. Aitken that Dr. Thomas reported she was "too old to go out [in the field] anymore."

60. The fact that this comment had been included, despite the several (unaddressed) reasons for Dr. Thomas's accommodation request, shows the discriminatory animus Dr. Thomas faced on the basis of her age.

61. At 73 years old, Dr. Thomas was the oldest person on her team.

62. By all accounts, Dr. Thomas was qualified as Lead Psychiatrist. In her six-plus years at VNS, she succeeded in providing unparalleled care to her patients.

63. Indeed, Dr. Thomas learned that after VNS terminated her employment, her role had eventually been filled by two nurse practitioners who were substantially younger and less qualified than her.

## IV. VNS UNLAWFULLY TERMINATES DR. THOMAS

64. On September 23, 2022, Ms. Aitken, Dr. Crasta and Emily Hershman ("Ms. Hershman"), an HR Generalist, inexplicably terminated Dr. Thomas over Zoom.

65. As Ms. Aitken requested to meet with Dr. Thomas, she thought that Ms. Aitken would finally address her accommodation request. Shortly after joining, Dr. Thomas asked whether anyone received her accommodation request because no one had contacted her.

66. Ms. Aitken replied that accommodation requests must be reviewed and approved every 30 days and medical documentation must be updated every 90 days. Had anyone from VNS engaged with Dr. Thomas about her accommodation request, they would have been aware of her prior request and documentation that had been submitted in June 2022.

67. Instead, more than three months later, Ms. Aitken claimed that Dr. Thomas had no current accommodation in place.

68. Dr. Thomas was in shock and firmly objected, reiterating that her accommodation had never been approved and that no one spoke to her about it.

69. Ms. Aitken brushed Dr. Thomas off by stating that they were not going to discuss her request now, and immediately ordered Dr. Thomas to report to the field on Monday.

70. Ms. Aitken gave Dr. Thomas an ultimatum: either she returns to the field immediately, resigns or be terminated.

71. Dr. Thomas protested that she would not resign from a job that she loved and had been performing satisfactorily for the past six years. She also reiterated that she was unable to return to the field due to her disability.

72. Ms. Aitken replied that since Dr. Thomas was not going to resign or return in-person to the field, VNS would be terminating her employment.

  A. **Dr. Thomas's Request was Undeniably Reasonable**

73. On September 27, 2022, in an email from Ms. Hershman to Dr. Thomas, Ms. Hershman explained that a purported reason for Dr. Thomas's termination was that New York State's ("NYS") Office of Mental Health ("OMH") required that she "conduct a minimum of 80% of [her] patient visits in person." Ms. Hershman also claimed that Dr. Thomas's refusal to return to field work "goes against NYS requirements of the ACT program."

74. VNS's "explanation" is misleading. In September 2022—the month VNS unlawfully terminated Dr. Thomas and in response to the COVID-19 PHE—the OMH adopted changes to Section 596 of the New York Codes, Rules and Regulations ("NYCRR") that made permanent many of the already existing telehealth services.

9

75.     Importantly, the fact that NYS OMH even adopted such changes to support the use of telehealth services is evidence of the reasonableness of Dr. Thomas's request to continue to treat her patients remotely.

76.     Even as recent as April 2023, NYS's Telehealth Services Guidance for OMH Providers explained:

> Telehealth may be used to supplement in-person services to optimize engagement (e.g., for screening so that the individual can learn about choices in services), to temporarily provide care in circumstances where in-person engagement is not possible (e.g., risk of infection), or to engage others in the individual's care (e.g., family therapy sessions, collateral contacts, etc.).

77.     Further, the Drug Enforcement Administration ("DEA") has extended certain exceptions to existing DEA regulations because of the COVID-19 PHE. The regulations permit a prescribing practitioner, who had previously conducted an in-person evaluation, to prescribe controlled medication *via* telehealth to patients through November 11, 2024.[1]

78.     Upon information and belief, VNS was aware of this continued exception. Nevertheless, they denied Dr. Thomas's request for accommodation. By contrast, VNS transferred the care and found alternate coverage during the COVID-19 PHE and permitted medications and controlled substances to be prescribed to vulnerable patient populations *via* telehealth by providers who had not established in-person contact with patients, as Dr. Thomas had done.

---

[1]     *DEA, Substance Abuse and Mental Health Services Administration ("SAMHSA") SAMHSA Extend COVID-19 Telemedicine Flexibilities for Prescribing Controlled Medications for Six Months While Considering Comments from the Public*, U.S. Dep't of Justice, Drug Enforcement Administration (May 9, 2023), https://www.dea.gov/press-releases/2023/05/09/dea-samhsa-extend-covid-19-telemedicine-flexibilities-prescribing#:~:text=For%20any%20practitioner-patient%20telemedicine%20relationships%20that%20have%20been,for%20one%20year%20%E2%80%93%20through%20November%2011%2C%202024.

79. Even after the end of the COVID-19 PHE in May 2023, prescribers of controlled substances who had conducted in-person visits either prior to or during COVID-19—which Dr. Thomas did—were permitted to continue to prescribe such medications using telehealth.

### B. Dr. Thomas Suffers from Physical Manifestations of Emotional Distress

80. Less than a month after VNS's unlawful termination, Dr. Thomas felt severely unwell. By January 2023, Dr. Thomas was deemed to be in atrial fibrillation with mitral valve regurgitation, which required an electrical cardioversion procedure on January 12, 2023. Prior to this, Dr. Thomas never suffered from problems with her cardiac health.

81. Additionally, the venous insufficiency in her legs, which was one of the bases for her accommodation request, was so exacerbated by her distress that she had to have laser ablation in both legs in March 2023.

82. In April and May 2023, Dr. Thomas was hospitalized twice due to stress-induced diverticulitis, resulting in abscess drainage.

### V. VNS ACTED WITHOUT REGARD TO PATIENT SAFETY AND CARE

83. By summarily terminating Dr. Thomas's employment, VNS prevented Dr. Thomas from informing her patients that she could no longer treat them. In fact, Dr. Thomas's patients learned that she would no longer treat them from the nurse practitioners and social workers that served on Dr. Thomas's team.

84. VNS's abandonment of Dr. Thomas's patients exposes VNS to liability to professional misconduct:

> "[a]bandoning or neglecting a patient under and in need of immediate professional care, without making reasonable arrangements for the continuation of such care . . . without reasonable notice and under circumstances which seriously impair

11

the delivery of professional care to patients or clients" constitutes professional misconduct.[2]

85. Specifically, in the termination of a psychiatrist-patient relationship, the psychiatrist must give reasonable notice, which is generally considered to be 30 days.[3] However, when a psychiatrist serves patients who are in a "rural or otherwise underserved area, it may be necessary to provide longer notice."[4]

86. Given her patient population, Dr. Thomas's patients certainly qualified as "underserved" and "vulnerable."

87. Yet VNS did not allow Dr. Thomas to provide such notice or to assist her patients in finding a new therapist.

88. Following her unlawful termination, VNS ultimately transferred the care of Dr. Thomas's 68 patients to two nurse practitioners, who were substantially younger and less qualified than Dr. Thomas.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the ADA)
*Against Defendant VNS*

89. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

90. By the actions described above, among others, Defendant discriminated against Plaintiff based on her disability and/or perceived disability in violation of the ADA. .

---

[2] New York State Education § 6530, "Definitions of Professional Misconduct," New York State Education Law § 6530 Definitions of Professional Misconduct (ny.gov).

[3] *Ending the Physician/Patient Relationship*, American Psychiatric Association (2014), GeneralIssues-terminating-patient-relationships.pdf (psychiatry.org) ("In terminating the psychiatrist-patient relationship, a psychiatrist must: (1) give the patient reasonable notice and time to find a new therapist; (2) assist the patient in the process of finding a new therapist; and (3) provide records and information as requested by the new therapist.").

[4] Id.

91. As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

92. As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant in violation of the ADA, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

93. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the ADA, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of the ADA)**
*Against Defendant VNS*

94. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

95. By the actions described above, among others, Defendant retaliated against Plaintiff for engaging in protected activities in violation of the ADA.

96. As a direct and proximate result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

97. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the ADA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

98. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the ADA, for which Plaintiff is entitle to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
*Against Defendant VNS*

99. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

100. By the actions described above, among others, Defendant discriminated against Plaintiff based on her age and disability in violation of the NYSHRL, including failing to provide reasonable accommodations.

101. As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, for which she is entitled an award of monetary damages and other relief.

102. As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

103. Defendant's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which she is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
*Against Defendant VNS*

104. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

105. By the actions described above, among others, Defendant retaliated against Plaintiff for protesting discrimination on the basis of her disability as well as seeking reasonable accommodation for her disability.

106. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, for which she is entitled to an award of monetary damages and other relief.

107. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

108. Defendant's unlawful and retaliatory actions constitute willful malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which she is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against Defendant VNS*

109. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

110. By the actions described above, among others, Defendant discriminated against Plaintiff based on her age and disability in violation of the NYCHRL, including failing to engage in a cooperative dialogue and failing to provide reasonable accommodations.

111. As a direct and proximate result of Defendant unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

112. As a direct and proximate result of Defendant' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

113. Defendant's unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
*Against Defendant VNS*

114. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

115. By the actions described above, among others, Defendant retaliated against Plaintiff for protesting discrimination on the basis of her disability as well as seeking reasonable accommodations.

116. As a direct and proximate result of the unlawful retaliatory conduct committed by Defendant in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, for which she is entitled to an award of monetary damages and other relief.

117. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

118.  Defendant's unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless violations of NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.  A declaratory judgment that Defendant violated federal, state and city laws;

B.  An award of economic damages;

C.  An award of compensatory damages;

D.  An award of punitive damages;

E.  Prejudgment interest on all amounts due;

F.  An award of reasonable attorneys' fees and costs; and

G.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 14, 2024
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Marjorie Mesidor

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mmesidor@wigdorlaw.com

*Counsel for Plaintiff*